**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CHELSEA BOARDWINE PULLINS, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:19-cv-21 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| CONAGRA BRANDS, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**ENTRY AND ORDER GRANTING DEFENDANT CONAGRA BRANDS, INC.'S
MOTION FOR SUMMARY JUDGMENT (DOC. 25), DENYING PLAINTIFF
CHELSEA BOARDWINE PULLINS' MOTION FOR PARTIAL SUMMARY
JUDGMENT (DOC. 16), AND TERMINATING THE CASE**

---

Pending before the Court are competing motions.  Plaintiff Chelsea Boardwine Pullins ("Pullins") filed a Motion for Partial Summary Judgment (Doc. 16) ("Pullins' Motion") in which she seeks summary judgment on all but one of her claims.  Defendant Conagra Brands, Inc. ("Conagra") filed a Motion for Summary Judgment (Doc. 25) ("Conagra's Motion") in which it seeks summary judgment on all claims.  Both motions are fully briefed and ripe for review.  (Docs. 16, 25, 30, 31, 32, 33.)  For the reasons discussed below, the Court **GRANTS** Conagra's Motion (Doc. 25), **DENIES** Pullins' Motion (Doc. 16), and **TERMINATES** this case.

I.      <u>**BACKGROUND**</u>

For purposes of resolving Conagra's Motion, the following recitation includes undisputed facts and otherwise assumes the evidence of the nonmoving party (Pullins) as true and draws all reasonable inferences in her favor, as is appropriate at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S Ct. 2505, 91 L. Ed. 2d 202 (1986).

1

Pullins began working for Conagra in March 2016 at Conagra's Slim Jim manufacturing facility in Troy, Ohio as a temp worker through a temp agency.  In approximately September 2016, she transitioned into a full-time employee for Conagra as an operator on a production line:  the raw meat (stuffing) department's second shift.  This was a production position where Pullins would maintain and operate a machine on a product line.

The operator position was physically demanding and required Pullins to be on her feet. Pullins' job duties included that she was to keep a machine running and filled with meat, clipping off sections every so often while also keeping track of meat blends to make sure that she "matched everybody else" on the product line.  (Doc. 17 at PAGEID # 376-77.)  Among other things, everyone on the product line would need to ensure that they were all working on the same blend of meat at the same time.  She and her coworkers rotated between functions that included machine operation, looping sections of meat, and racking the meat.  The written job description for Pullins' operator position includes the following:

> **Position Summary:**  This person will be required to process frozen raw meat products for making sausage, pepperoni and SJ [Slim Jim] products.  This will require you rotate through all aspects of the stuff area…include[ing] operating stuffers, handling loops of product, racking, tub handling, and trolley washing. …
>
> **Hours:**  3:00 p.m. – 1:30 a.m.  …
>
> **Position Responsibilities:** …
>
> - Most tasks require bending, lifting and reaching
> - Ability to lift a smoke stick product (up to 35 lbs) 4 feet high onto the rack
> - Ability to lift 80lb repetitively
> - Ability to work in a cool environment 40 to 50 degrees 8-10 hours a day …
> - Must be able to work overtime and weekends as needed …

(Doc. 17-1 at PAGEID # 623-25 (emphasis in original).)

According to Conagra, each of those position responsibilities listed in the written job description were an essential function of the operator position, including working eight to ten hours

2

a day.  Pullins acknowledged that the shift she worked typically lasted eight to ten hours, although sometimes, out of necessity in production, she and her co-workers on the production line would work overtime with days lasting more than ten hours.  Conagra has never staffed the operator position with a part-time employee; part-time work does not exist on the production line, except for training purposes.

In or about 2008, several years prior to starting at Conagra, Pullins began suffering with degenerative disc disease.  She would receive periodic medical treatment for her back symptoms when they flared up.  Her chiropractor since 2015 has been Harold Schubert, DC ("Dr. Schubert").

In early August of 2017, after Pullins had started her employment as an operator for Conagra, Pullins' back symptoms flared-up, causing her debilitating pain.  She was diagnosed with a herniated disc, impinging her sciatic nerve and causing pain to shoot down both of her legs.

On August 9, 2017, Pullins saw Dr. Schubert, who determined that Pullins needed to be taken off work.  Pullins requested leave beginning on August 17, 2017.  Conagra approved the request.  Her Family Medical Leave Act ("FMLA") leave and short-term disability ("STD") leave ran concurrently.  At that point, Dr. Schubert anticipated that Pullins would be off work for two weeks.  However, at the end of the month, Dr. Schubert extended Pullins' time off work for an additional 30 days, which Conagra granted; then another 30 days through October 27, 2017, which Conagra granted; then several more days through November 15, 2017 (when Pullins' STD leave would expire), which Conagra again granted.  Dr. Schubert's decision to continuously keep Pullins off work during this time was based on his assessment of Pullins' condition.  In total, Conagra approved 91 consecutive days of leave.

Previously, in early 2017, Pullins had used a period of STD leave during a pregnancy.  Then, starting on April 25, 2017 and running over the next few months, Pullins had also used

3

intermittent leave under the FMLA for bonding with her newborn. On September 22, 2017, Pullins exhausted her 12 weeks of FMLA leave. By November 14, 2017, her STD leave was due to run out as well.

Prior to November 14, 2017, Pullins received a phone call from Conagra's HR Manager Shelly Barker ("Barker"). According to Pullins, Barker told her that she (Pullins) must either return to work by November 15 or be fired. Pullins wanted to return to work, felt like she could do it, and gave Dr. Schubert permission to confer with Conagra about possible accommodations. Dr. Schubert spoke with Barker, who said that Conagra was willing to make the effort to get Pullins back to work and volunteered that, if necessary, they would look at the possibility of "work-hardening."

Barker and Dr. Schubert spoke about Pullins' job duties. Dr. Schubert determined that Pullins could return to work on a limited basis: restricting her to working four hours daily for the next four days starting on November 15, 2017. Barker (from Conagra) agreed to allow Pullins to return to work for a "work-hardening period," which Barker did not know how long Conagra would provide. There was no defined upper limit, although it certainly would not be indefinite. Pullins asked Barker in late November about the possibility of extending a "work-hardening period" through February 2018 when Pullins' STD would pick back up. Barker told Pullins that Conagra would not be able to do that.

Pullins returned to work on November 15, 2017. According to Pullins, she suggested to Barker that—instead of working four-hour shifts for five days per week—she could work eight-hour shifts for three days per week, but Barker did not agree. Pullins spent the next few days viewing training videos. Dr. Schubert continued the four-hour daily restriction through November 22, 2017, and then later continued it again through December 4, 2017. Pullins' first day back on

the production floor was near the Thanksgiving shutdown, which began on or about November 22. The plant reopened on November 27, 2017.  Upon returning to the production floor, Pullins underwent re-training for machine operation and other procedures alongside a co-worker.  During this time, Pullins continued to suffer with back pain, but she went to work for the four hours daily.

On Friday, December 1, 2017, Pullins went to the emergency room at a hospital because of back pain.  She was administered a pain reliever (Narco) in the ER.  However, she went to work after being released.  According to Pullins, upon exiting the breakroom at work later that day, Conagra's Employee Relations Manager, Chuck Verhoff ("Verhoff"), stopped her.  Verhoff asked Pullins how she was doing and commented that she looked like she was in pain.  Pullins agreed that she was in pain and explained that she was suffering with a herniated disc, was undergoing treatment from her doctor, and was working four-hour shifts for purposes of work-hardening. Verhoff asked what she was assigned to do that day, to which Pullins replied that she was pushing tubs.  Verhoff said "no, I can't have that," and then they went into an office to speak some more. Verhoff testified that he sympathized with Pullins because he too had suffered with sciatic nerve pain and knew how painful that condition can be.

They had a lengthy conversation, and Verhoff decided that he was going to have Pullins go home until he spoke with Barker about the situation.  Pullins asked him why he was sending her home, and, according to Pullins, Verhoff responded "because you are in pain and I can't have you working like that because you just told me you have back issues, and if you have a back issue and you're pushing tubs, you could move one wrong way and injure yourself again."  (Doc. 17 at PAGEID # 511.)  Pullins told Verhoff that she really did not want to go home and was working through the pain.  Verhoff testified that he "told her it was not in our -- her best interest to be back on the floor in the condition that she was in.  So I personally could not allow her to go back out

5

onto the floor." (Doc. 20 at PAGEID # 994.) Verhoff told Pullins that he would call her on Monday morning to let her know of her status. According to Pullins, she informed Verhoff that she would be evaluated again by her doctor the following Monday and she was hoping to be released to full-duty work with no restrictions.

On Monday, December 4, 2017, Verhoff called Pullins. He told her that he had spoken to Barker, and that Barker had told him that all efforts to help Pullins had been exhausted, Pullins was out of STD leave, and Pullins was out of FMLA leave. He also said that she was in too much pain to do her job. Verhoff informed Pullins that they saw no other option than to terminate her employment. Pullins said "okay" and asked if she would be considered for rehire later on. Verhoff said no, and that he was sorry. Verhoff involuntarily terminated Pullins' employment at Conagra.

Because her insurance was cut-off, Pullins cancelled her doctor appointment scheduled for later that day. Since her August 9, 2017 appointment, Dr. Schubert had never told Pullins that she could work eight-hour days at Conagra. (Doc. 17 at PAGEID # 545-46.) Pullins subsequently requested and received a termination letter from Verhoff so that she could apply for benefits through Ohio Job and Family Services. The letter, dated December 5, 2017, stated: "Chelsea Pullins has been terminated from our employment effective 12/04/17. She stated that she is physically unable to work her normal duties.[1] Ms. Pullins had exhausted her FMLA leave along with her short term disability." (Doc. 17-16.)

Pullins brings five claims against Conagra in her Complaint: (1) disability discrimination— by discharging her on the basis of her disability—in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; (2) disability discrimination—by failing to reasonably

---

[1] Pullins testified that she never told Verhoff or Conagra that she "couldn't physically do the duties." (Doc. 17 at PAGEID # 551.) For purposes of deciding Conagra's Motion, the Court assumes as true Pullins' testimony that she never told Verhoff or Conagra that she could not physically perform the duties. Pullins admitted that the rest of the letter is correct and that she had asked for a termination letter to use in filing for unemployment benefits.

accommodate her disability—in violation of the ADA; (3) disability discrimination in violation of

Ohio Revised Code ("O.R.C.") § 4112 *et seq.*; (4) failure to accommodate in violation of O.R.C.

§ 4112 *et seq.*; and, (5) violation of the FMLA.  (Doc. 1.)  Thus, counts 1 and 3 are discriminatory

discharge claims under federal and state law (respectively), counts 2 and 4 are failure to

accommodate claims under federal and state law (respectively), and count 5 is a FLMA claim

under federal law.[2]

## II.  LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."  *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250, 106 S Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the

basis for its motion and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file together with the affidavits which it believes demonstrate

the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the nonmoving party, who "must

set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250

---

[2] Prior to filing suit in this Court, Pullins filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the ADA.  (*See* Doc. 1 at PAGEID # 5; Doc. 1-2; Doc. 3 at PAGEID # 30.)  She obtained a Notice of Rights letter indicating that the EEOC was terminating its processing of her charge.  (*Id.*)

(quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

"[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Id.* at 255; *Matsushita*, 475 U.S. at 587. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). The Court relies on the Rule 56 evidence called to its attention by the parties. *See* Fed. R. Civ. P. 56(c), (e).

III. **ANALYSIS**

The Court first addresses Conagra's Motion. In the briefing for that motion, Conagra

argues that Pullins' ADA and O.R.C. § 4112.02 claims (Counts 1, 2, 3, and 4) fail because she cannot show that she was "otherwise qualified" for the operator position.  As to Pullins' FMLA claim (Count 5), Conagra makes three arguments for why the claim fails:  (1) Pullins lacks standing to pursue it; (2) as to her interference theory, Conagra did not deny her any FMLA benefits to which she was entitled and, as to her retaliation theory, Pullins cannot show a causal connection between her protected activity and her termination; and (3) Pullins cannot show that Conagra's (allegedly) legitimate, non-discriminatory reason for her termination is a pretext for FMLA retaliation.

### A.  ADA and O.R.C. § 4112.02 Claims (Counts 1, 2, 3, and 4)

The Sixth Circuit has explained that "Ohio's disability-discrimination statute and the ADA employ the same analysis."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007). Therefore, the analysis below applies to Pullins' claims under the ADA, as well as her claims under O.R.C. § 4112.02.  *Id.*; *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1031 n. 1 (6th Cir. 2014) (courts "consider the ADA and [Ohio] state law claims simultaneously by looking to the cases and regulations that interpret the ADA") (internal quotation marks omitted); *Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 256 (6th Cir. 2019) (courts may analyze 42 U.S.C. § 12112 and O.R.C. § 4112.02 collectively).

"The ADA was enacted in response to congressional findings highlighting 'the continuing existence of unfair and unnecessary discrimination and prejudice [that] denies people with disabilities the opportunity to compete on an equal basis.'"  *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 415 (6th Cir. 2020) (quoting 42 U.S.C. § 12101(a)(8)).  ADA discrimination claims alleging discriminatory discharge (termination) on the basis of disability are distinguishable from claims alleging failure to make reasonable accommodations.  *See Kleiber*, 485 F.3d at 868 n.2; *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).  Additionally, "ADA discrimination

claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Fisher*, 951 F.3d at 416.

Here, Pullins claims both discriminatory discharge (Counts 1 and 3) and failure to make reasonable accommodations (Counts 2 and 4). She argues that those claims are premised on direct evidence of discrimination. *Fisher*, 951 F.3d at 416 ("[d]irect evidence of disability discrimination does not require the fact finder to draw any inference to conclude that the disability was at least a motivating factor") (internal quotation marks omitted). Conagra disputes that there is direct evidence of discrimination. However, that dispute turns out to be immaterial in this case. Therefore, the Court's analysis below assumes, for purposes of Conagra's Motion, that Pullins' ADA claims are premised on direct evidence.

As shown below, the Court's decision on those four claims comes down to whether Pullins can establish that she is "qualified" under the ADA. The Court finds that she cannot. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) ("[a]s a threshold matter in every disability-discrimination claim, a plaintiff must demonstrate that (1) she is disabled; and (2) <u>she is otherwise qualified for the position</u> despite her disability, either with or without a reasonable accommodation") (internal quotation marks omitted) (emphasis added). The dispute regarding whether there is direct evidence of discrimination turns out to be immaterial because both discriminatory discharge and failure to accommodate claims—and regardless of whether the plaintiff relies on direct or indirect evidence[3]—require the plaintiff to establish that he or she is

---

[3] ADA claims premised upon <u>indirect</u> evidence (circumstantial-evidence cases) apply "the familiar *McDonnell Douglass* burden-shifting framework." *Kleiber*, 485 F.3d at 869. However, the Sixth Circuit has determined that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination" in the context of summary judgment motions. *Id.* at 868 (explaining that "[t]his conclusion is consistent with the definition of direct evidence, for if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination"); *see also Fisher*, 951 F.3d at 416 (same); *Hunt*, 769 F. App'x at 256-58 (separately setting forth the elements for a *prima facie* discriminatory discharge claim and a failure to accommodate claim under the *McDonnel Douglass* burden-shifting framework for when a plaintiff relies on <u>indirect</u> evidence).

10

"qualified" under the ADA.[4]  *Id.*; *Rorrer*, 743 F.3d at 1038 (direct evidence for discriminatory discharge claim); *Fisher*, 951 F.3d at 417 (direct evidence for failure to accommodate claim) (internal quotation marks omitted).

### (1) Discriminatory discharge claims (Counts 1 and 3)

One way in which an employer discriminates against a qualified employee under the ADA is by taking an adverse action against the employee—such as terminating her—because of the employee's disability.  The ADA mandates that no employer "shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees…."  42 U.S.C. § 12112(a); 42 U.S.C. § 12111(2).

When a plaintiff makes a discriminatory discharge claim premised upon direct evidence, the claim is analyzed under the following framework:

> First, the plaintiff must establish a prima facie case by showing that he [or she] is disabled and otherwise qualified for the position, either with or without reasonable accommodation.  Once the plaintiff has established a prima facie case, the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business.

*Rorrer*, 743 F.3d at 1038-39.  Thus, this claim requires Pullins to establish that she is a "qualified individual" and "otherwise qualified for the position."  42 U.S.C. § 12112(a); *Rorrer*, 743 F.3d at 1038-39.

Conagra argues that Pullins cannot establish that she was "otherwise qualified" for the operator position within the meaning of the ADA "because the restriction imposed by Dr. Schubert rendered her unable to perform the essential functions of the job, with or without reasonable accommodation."  (Doc. 25 at PAGEID # 1622.)  Conagra asserts that Pullins made only one

---

[4] Pullins admits that, "[w]hether a direct or indirect analysis is applied to the facts in this case, [she] bears the burden of proving that she is disabled and otherwise qualified to perform the essential functions of her position, with or without reasonable accommodation."  (Doc. 30 at PAGEID # 1788.)

accommodation request with respect to actually working as an operator:  that she be allowed to work part-time, four-hour shifts in the operator position until February 2018.[5]  (*Id.* at PAGEID # 1625.)  Yet, according to Conagra, that accommodation is *per se* unreasonable for a number of reasons, including that (1) it would remove an essential function of the operator position, namely "the ability to operate the stuffing machine through an entire production cycle, which is typically eight to ten or more hours;" and (2) "it is really a request for Conagra to create a part-time job that does not exist"—a part-time position that would require filling the second half of her operating shift with another employee.  (*Id.* at PAGEID # 1625-27.)

In response, Pullins argues that she "was 'otherwise qualified' to perform the essential functions of her position because she was able to perform the essential functions of her position *with accommodation*."  (Doc. 30 at PAGEID # 1790 (emphasis in original).)  She says that her "temporary inability to work full-time could be cured with a reasonable accommodation."  (*Id.* at PAGEID # 1788.)  Pullins maintains that accommodations were available to disabled employees like her, including temporary, part-time work-hardening schedules.  (*Id.* at PAGEID # 1777.)  According to Pullins, that was "precisely the accommodation that [her] doctor recommended, and that [Conagra] agreed to provide, but then inexplicably revoked."  (*Id.* at PAGEID # 1779.)

Pullins also argues that, if "the work-hardening accommodation had become unsatisfactory to [Conagra, then Conagra] had a continuing obligation to explore other accommodation options."  (*Id.* at PAGEID # 1792.)  Yet, in Pullins' opinion, Conagra "did not engage in the interactive accommodation process."  (*Id.* at PAGEID # 1780.)  She asserts that "other employees had been

---

[5] Conagra also argues that, between November 15, 2017 and December 1, 2017, Pullins was "re-validating her skills by observing training videos and shadowing other operators," thus performing "re-training tasks [that] were temporary in nature."  (Doc. 25 at PAGEID # 1625.)  According to Conagra, Pullins was "neither expected, nor assigned, to perform the essential operator functions at that time, because those essential functions cannot be done in a four-hour shift."  (*Id.*)

accommodated with reduced schedules in the same way that [she] was accommodated," and that other possible accommodations included: (1) allowing her to work eight-hour days for three days a week; (2) allowing her to go on unpaid medical leave; and (3) having her perform one of two roles typically used for accommodations, namely gluing and breaking. (*Id.* at PAGEID # 1778-80.)

"An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not." *Williams*, 847 F.3d at 391 (citing 42 U.S.C. § 12111(8)). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. 1630.2(m). Thus, Pullins must show that she could "perform the essential functions of the" operator position, with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Rorrer*, 743 F.3d at 1038-39; *Hostettler*, 895 F.3d at 854 ("To show that she is otherwise qualified for a position—and thus meet her *prima facie* burden—an employee must show that she can perform the essential functions of a job with or without an accommodation"). However, it is the employer who first bears the burden of showing that a function is an essential function of the employment position. *Fisher*, 951 F.3d at 419.

In determining a position's "essential functions," the ADA explains that "consideration should be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 761-62 (6th Cir. 2015) (en banc) ("[e]ssential functions generally are those that the employer's judgment and written job description prior to litigation deem essential") (internal quotation marks omitted).

13

There is a "general rule" that "regularly attending work on-site is essential to most jobs, especially interactive ones," and that general rule "aligns with the text of the ADA." *Ford*, 782 F.3d at 761 (finding that plaintiff was not "qualified" because her excessive absences prevented her from performing the essential functions of her position). The EEOC's regulations "define essential functions as those that are 'fundamental' (as opposed to 'marginal'), so that a job is 'fundamentally alter[ed]' if an essential function is removed." *Id.*, at 762 (internal citation omitted) (citing 29 C.F.R. § 1630.2(n)); *see also* 42 U.S.C. § 12116 (statutory authority for regulations); *Hostettler*, 895 F.3d at 854 ("[a] job function is essential if its removal would fundamentally alter the position").

"To guide the essential-function inquiry, the regulations speak in factors—seven of them." *Ford*, 782 F.3d at 762; *see also Green v. BakeMark USA, LLC*, 683 F. App'x 486, 492 (6th Cir. 2017) (explaining that the seven factors are non-exclusive).

Evidence of whether a particular function is essential includes, but is not limited to:

(i)     The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)     The terms of a collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). "In many jobs, especially the interactive ones, all seven point toward finding regular and predictable on-site attendance essential." *Ford*, 782 F.3d at 762. Thus, "most jobs would be *fundamentally altered* if regular and predictable on-site attendance is removed." *Id.* (emphasis in original).

14

The Sixth Circuit has found full-time work to be an essential function for certain jobs. *See, e.g., White v. Standard Ins. Co.*, 529 F. App'x 547 (6th Cir. 2013) (finding that full-time work, not part-time, was an essential function of a customer service agent position, and affirming summary judgment for defendant-employer where the plaintiff-employee had suffered a non-work-related back injury, returned to work part-time with medical restrictions that she work not more than four hours a day, but was terminated); *Green*, 683 F. App'x 486 (finding that full-time, on-site attendance was an essential function of an operations manager position, and affirming summary judgment for defendant-employer where the plaintiff-employee had undergone surgery, submitted a doctor's note allowing him to return to a part-time schedule, and was terminated).

However, "full-time presence at work is not an essential function of a job simply because an employer says that it is." *Hostettler*, 895 F.3d at 857; *see also Ford*, 782 F.3d at 765 (it is not the case that "whatever the employer says is essential necessarily becomes essential"). "If it were otherwise, employers could refuse *any* accommodation that left an employee at work for fewer than 40 hours per week," which "could mean denying leave for doctor's appointments, dialysis, therapy, or anything else that requires time away from work." *Hostettler*, 895 F.3d at 857 (emphasis in original). Thus, "[a]n employer cannot deny a modified work schedule as unreasonable unless the employer can show *why* the employee is needed on a full-time schedule…." *Id.* (emphasis in original).

Pullins does not specifically dispute that working full-time was an essential function of the operator position.[6] Regardless, the Court finds that Conagra has shown that working full-time and on-site is an essential function of the operator position. The written job description states that the position's responsibilities include working 8 to 10 hours a day. (Doc. 17-1 at PAGEID # 623-25.)

---

[6] She also admits there is no "dispute that employees assigned to [Pullins'] department are normally required to work a full-time schedule." (Doc. 30 at PAGEID # 1777.)

In Conagra's judgment, working those hours is an essential function of the position. (Doc. 21 at PAGEID # 1194.) The job involves performing functions on a production line inside of a facility—operating a machine, looping sections of meat, and racking meat, while ensuring synchronization with other employees who are working together with the operator on the line. And, the operator needs to be on-site at the production facility to perform those physical duties throughout a production cycle. Additionally, part-time work does not exist on the production line, except for training purposes. Pullins also admitted she would work overtime in the position—sometimes "five days in a row, ten-hour days or more … out of necessity in production." (Doc. 17 at PAGEID # 394.) Thus, full-time, on-site work is an essential function of the operator position. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3); *Ford*, 782 F.3d at 761-62; *White*, 529 F. App'x at 549-50 (finding that full-time work was an essential function of the position at issue and granting summary judgment for defendant-employer); *Green*, 683 F. App'x at 492-93 (finding that full-time attendance was an essential function of the position at issue and granting summary judgment for defendant-employer).

Instead, Pullins argues that she was able to perform the essential functions with an allegedly reasonable accommodation: her requested "temporary" part-time work schedule of working four-hour days for five days a week. (Doc. 30 at PAGEID # 1788-89.) However, she fails to explain how this accommodation "would have enabled [her] to perform the essential functions of her job." *Williams*, 847 F.3d at 393-94 (affirming summary judgment for employer where employee failed to make a *prima facie* showing that she would have been otherwise qualified even with the proposed accommodations and, therefore, the court did not need to consider whether such accommodations were reasonable). More specifically, Pullins does not show how she could have fulfilled the essential function of working on-site full-time "even with her requested

16

accommodations." *Id.*; *see also Gantt v. Wilson Sporting Goods, Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA").

"The *employee* bears the burden of proposing an accommodation that will permit her to effectively perform the essential functions of her job." *Ford*, 782 F.3d at 763 (emphasis in original); *see also Williams*, 847 F.3d at 393-94 (plaintiff could not show that her proposed accommodations would have enabled her to perform the essential functions of her job where the medical evidence revealed that she could not work at all for significant period of time). In *Green*, the Sixth Circuit held that "a twenty-hour-per-week part-time work schedule would not have allowed [plaintiff-employee] to perform the essential functions of the operations-manager position," so his "proposed accommodation [to work a temporary part-time schedule] was therefore unreasonable, and [defendant-employer] was not required to provide it." *Green*, 683 F. App'x at 493; *see also White*, 529 F. App'x at 549-50. The same analysis applies here. Quite simply, working only four hours each day does not allow Pullins to work eight to ten hours each day. Therefore, Pullins has failed to show that she was "otherwise qualified for the position" with that accommodation.

Furthermore, a reasonable accommodation "does *not* include removing an 'essential function' from the position, for that is *per se* unreasonable." *Ford*, 782 F.3d at 761 (emphasis in original); *see also Green*, 683 F. App'x at 491. However, that is what Pullins' proposed accommodation to allow her to work part-time would do. As explained in *Ford*, "the essential-job-function inquiry does not require employers to lower their standards by altering a job's essential functions." *Id.* at 764. And, as explained in *Green*, "while a part-time work schedule may be a reasonable accommodation in some cases, it is unreasonable in situations where the

essential functions of the job require full-time attendance." *Green*, 683 F. App'x at 491-92 (internal citation omitted).

Additionally, the ADA does not require employers to create a new part-time position or incur additional expenses to have others cover part of the time for a position that requires full-time attendance. *Green*, 683 F. App'x at 493 ("the ADA did not require [defendant-employer] to create a special, part-time position in order to accommodate" plaintiff-employee or incur additional expenses to have others work the part of the day that plaintiff-employee could not). And, "[r]easonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected." *Gantt*, 143 F.3d at 1047.

The same analysis applies to the proposed accommodation of allowing Pullins to work eight-hour days for three days a week. That accommodation is simply another part-time work schedule, just structured differently. Thus, Pullins fails to show that she was "otherwise qualified for the position" with that accommodation as well. *Williams*, 847 F.3d at 393-94; *Ford*, 782 F.3d at 763; *Green*, 683 F. App'x at 491-93.

The other two alleged reasonable accommodations argued by Pullins—(1) allowing her to go on unpaid medical leave or (2) having her perform one of two roles typically used for accommodations, namely gluing and breaking—do not save her claims. The initial burden of requesting an accommodation is on the employee, i.e., Pullins. *Green*, 683 F. App'x at 493-94 (an employee must show that he or she actually requested an accommodation, and the employer is not required to speculate as to the extent of the employee's need or desire for an accommodation); *Gantt*, 143 F.3d at 1046 ("the initial burden of requesting an accommodation [is] on the employee"). However, there is no evidence that Pullins ever requested either of those

18

accommodations.[7] Thus, Pullins cannot meet her burden of establishing a *prima facie* case based on either of those post-termination proposed accommodations.

Additionally, regarding unpaid medical leave, "[a]lthough medical leave can sometimes constitute a reasonable accommodation under the ADA, [Sixth Circuit] case law is clear that when the proposed accommodation is an extension of a prior significant period of leave, the plaintiff must have demonstrated a clear prospect for recovery." *Cooley v. E. Tenn. Human Res. Agency, Inc.*, 720 F. App'x 734, 741 (6th Cir. 2017) (internal citation removed). As the Sixth Circuit explained, "[a]n employer is not required to keep an employee's job open indefinitely," and "additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated no clear prospects for recovery." *Williams*, 847 F.3d at 394 (internal quotation marks omitted). The evidence shows such is the case here. "The relevant inquiry is whether the employee showed her employer a certain or credibly proven end to the leave." *Cooley*, 720 F. App'x at 741 ("for an additional leave of absence to be a reasonable accommodation under the ADA, the employee must, at a minimum, provide the employer with an estimated, credible date when she can resume her essential duties"). Pullins did not make that showing.

Regarding Pullins' argument that Conagra allegedly did not engage in the interactive accommodation process, her "reliance on the ADA's interactive process puts the cart before the horse." *Cooley*, 720 F. App'x at 739. "[T]he failure to engage in the ADA's interactive process 'is actionable only if it prevents identification of an appropriate accommodation *for a qualified individual*.'" *Id.* (quoting *Ford*, 782 F.3d at 766). In other words, the plaintiff-employee must first "demonstrate that she was qualified for the position" before she can take issue with the

---

[7] Pullins expressly admits that she "never specifically requested an unpaid medical leave extension." (Doc. 30 at PAGEID # 1779.)

interactive accommodation process. *Williams*, 847 F.3d at 395 ("[b]ecause we conclude that [plaintiff-employee] has failed to make a prima facie showing that she was qualified for her position … with or without a reasonable accommodation, we need not consider whether [defendant-employer] failed to engage in the interactive process"); *see also Ford*, 782 F.3d at 766 ("[o]ur conclusion that [plaintiff-employee] was unqualified for her position makes it unnecessary to consider whether [defendant-employer] showed bad faith in the discussions to work out a reasonable accommodation while [plaintiff-employee] was still employed").

Finally, the three main cases that Pullins argues demonstrate that she was "otherwise qualified" to perform the essential functions of the operator position are distinguishable.[8] (*See* Doc. 30 at PAGEID # 1790). In *Hostettler*, the plaintiff-employee was a human resources generalist who suffered from postpartum depression and separation anxiety after giving birth. *Hostettler*, 895 F.3d at 848-89. Unlike the case here, the plaintiff-employee "presented evidence that she satisfied all the core tasks of her position." *Id.* at 855. The court found that the employer did not explain why plaintiff-employee could not complete the essential functions of her job unless she was present in the office 40 hours a week. *Id.* at 856-57. And, there were fact issues regarding whether the employee was completing all of her work during her part-time schedule. Here, given the nature of the operator position (which is significantly different from the HR generalist position in *Hostettler*), Pullins could not complete the essential functions of the operator position during a

---

[8] Additionally, although she does not rely on it in her briefing on Conagra's Motion, in her reply in support of Pullins' Motion, Pullins argues that *White v. Honda of Am. Mfg., Inc.*, 191 F. Supp. 2d 933 (S.D. Ohio 2002) "is directly on point" with her case. (Doc. 32 at PAGEID # 1952.) However, that case too is readily distinguishable. Unlike this case, in *White*, the plaintiff-employee's doctor had released her to return to work <u>without any restrictions</u>. *White*, 191 F. Supp. 2d at 940. However, despite the full medical release from White's doctor, her employer "did not believe" that she was medically able to work. *Id.* Also, there was a fact issue in *White* regarding whether her employer had spoken with White's doctor's staff regarding whether she was medically capable of returning to active employment. *Id.* at 941 ("[t]he statement memorialized by [defendant's assistant manager] is in conflict with [plaintiff's doctor's] January 21, 2000 return to work report which placed no limitation on Plaintiff"). The issue in *White* did not involve an analysis of whether the plaintiff-employee could perform the essential functions of the position. *See id.* at 948-49.

20

part-time schedule.

In *Fisher*, although the plaintiff-employee worked in a factory like Pullins, the case involved whether the employee was unqualified for the position because of <u>absenteeism</u>, and the issue revolved around whether any reasonable accommodation could cure his attendance problem. *Fisher*, 951 F.3d at 418 (finding that the employee's "absences do not in and of themselves render him unqualified for his position"). However, the issue here does not involve absenteeism; it involves whether Pullins was unqualified for the position, even with a requested reasonable accommodation, because she was unable to perform its essential functions.

In *Cleveland*, the issue was "whether medical leave for the period of time that Plaintiff was pregnant and unable to take her lupus medication would have constituted a reasonable accommodation." *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 78 (6th Cir. 2003). The court found that it could not "say that as a matter of law Plaintiff could not carry the burden of showing that a medical leave would have been a reasonable accommodation of her lupus during her pregnancy," and also that a genuine issue of material fact remained as to whether granting the plaintiff-employee such leave would have imposed an undue hardship on the defendant-employer. *Id.* at 79, 81. Those issues are not presented in this case.

Therefore, Conagra is entitled to summary judgment on Pullins' discriminatory discharge claims (Counts 1 and 3). Pullins "must prove that [she] is a 'qualified individual,' which means she can perform the essential functions of [the operator position] with a reasonable accommodation." *Ford*, 782 F.3d at 766. However, Pullins fails to show that she is a "qualified" individual, Pullins' proposed accommodation is "not reasonable because it would have removed at least one essential function from her job" (namely, working full-time with on-site attendance), and there is no genuine issue of material fact.

21

**(2) <u>Failure-to-accommodate claims (Counts 2 and 4)</u>**

Another form of discrimination (besides terminating a qualified employee on the basis of disability) occurs when an employer fails to make reasonable accommodations to the known disability of an otherwise qualified employee, unless those accommodations would cause undue hardship to the employer. Again, the ADA mandates that an employer not "discriminate against a qualified individual on the basis of disability…." 42 U.S.C. § 12112(a). The ADA's definition of the term "discriminate against a qualified individual on the basis of disability" includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]." 42 U.S.C. § 12112(b)(5)(A).

Under the ADA, a "reasonable accommodation" <u>may</u> include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). However, as stated above, a reasonable accommodation "does *not* include removing an 'essential function' from the position, for that is *per se* unreasonable." *Ford*, 782 F.3d at 761 (emphasis in original).

When a plaintiff makes a failure-to-reasonably-accommodate claim premised upon direct evidence, the claim is analyzed under the following framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of

22

> proving that a challenged job criterion is essential, and therefore a business
> necessity, or that a proposed accommodation will impose an undue hardship upon
> the employer.

*Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir.

2004)); *see also Fisher*, 951 F.3d at 417. Thus, like a discriminatory discharge claim, this claim

requires Pullins to establish that she is a "qualified individual" and is "otherwise qualified for the

position." 42 U.S.C. § 12112(a); *Kleiber*, 485 F.3d at 869.

As shown above, Pullins fails to show that she is "qualified" under the ADA for the

operator position. For this same reason, Pullins' disability discrimination claims on the basis of

an allege failure to accommodate cannot succeed. *Kleiber*, 485 F.3d at 869; *see also Ford*, 782

F.3d at 763 (where, in a failure-to-accommodate claim, the employee requests an accommodation

that exempts her from an essential function of the job, "the essential functions and reasonable

accommodations analyses [] run together," such that "[o]ne conclusion (the function is essential)

leads to the other (the accommodation is not reasonable)"); *Williams*, 847 F.3d at 391-95

(affirming summary judgment for defendant-employer on failure to accommodate claim where

plaintiff failed to make a *prima facie* showing that she would have been otherwise qualified even

with the requested accommodations); *Green*, 683 F. App'x at 491-93. Therefore, Conagra is

entitled to summary judgment on Pullins' failure to accommodate claims (Counts 2 and 4).[9]

### B. FMLA Claim (Count 5)

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year

if, among other things, an employee has a 'serious health condition that makes the employee unable

to perform the functions of the position of such employee.'" *Edgar v. JAC Prods., Inc.*, 443 F.3d

---

[9] The Court does not reach Conagra's additional arguments in support of summary judgment because it is unnecessary to do so. *See Green*, 683 F. App'x at 493 n.7 ("Because [plaintiff-employee] could not perform the essential functions of the operations-manager position with or without reasonable accommodation," the court does not need to address alternative arguments, such as whether defendant-employer's grant of leave was a reasonable alternative accommodation).

501, 506 (6th Cir. 2006). The FMLA makes it unlawful for an employer (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA statute, and (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA statute. *See* 29 U.S.C. § 2615(a).

Pullins alleges that Conagra violated her FMLA rights through its (1) refusal to reinstate her to her former position (or a comparable position) after taking medical leave; and (2) terminating her in retaliation for taking FMLA leave. (*See* Doc. 1 at PAGEID # 9-10.) Thus, she alleges both an entitlement theory and a retaliation theory. (*Id.*) As referenced above, Conagra argues that it is entitled to summary judgment on the FMLA claim for three reasons: (1) Pullins lacks standing to pursue it; (2) as to her interference theory, Conagra did not deny her any FMLA benefits to which she was entitled and, as to her retaliation theory, Pullins cannot show a causal connection between her protected activity and her termination; and (3) Pullins cannot show that Conagra's (allegedly) legitimate, non-discriminatory reason for her termination is a pretext for FMLA retaliation.

In response, Pullins does not directly address Conagra's arguments. She argues the evidence demonstrates that, had she "not used all her FMLA, she would not have been fired." (Doc. 30 at PAGEID # 1793.) In support, Pullins points to Verhoff's testimony that she was involuntarily terminated and, because she had exhausted her FMLA and STD leave, she had no other options at that point in time. (*Id.* at PAGEID # 1795 (citing Doc. 20 at PAGEID # 1036-37).) Pullins further argues that it did not matter to Conagra whether alternative accommodations might have been available, that Verhoff admitted he did not assess whether it was feasible for Pullins to continue the four-hour work schedule, and Verhoff did not consider contacting her physician to obtain more insight on Pullins' condition. (Doc. 30 at PAGEID # 1795.) Instead,

24

according to Pullins, "[a]ll that mattered to Verhoff was his opinion that she could not physically perform her duties *and* she had exhausted her leave entitlement." (*Id.* (emphasis in original).)

### (1) Entitlement theory

"Under the entitlement theory (which some courts refer to as the interference theory), the issue is simply whether the employer provided its employee the entitlements set forth in the FMLA…." *Edgar*, 443 F.3d at 507 (quotation marks omitted). "Qualifying employees who return to work within that 12-week period are entitled to be reinstated to their previous position, or 'to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Id.* at 506 (quoting 29 U.S.C. § 2614(a)(1)). However, "an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Id.* at 506-07.

"Employees invoking the entitlement theory must prove that their employer interfered with or denied them an FMLA benefit to which they were entitled." *Edgar*, 443 F.3d at 511. "This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue." *Id.* "[T]his central question must be answered in the negative when the employee is incapable of returning to work, or of performing an essential function of her position, at the end of the statutory-leave period." *Id.* at 511-512.

Here, as in *Edgar*, "no dispute exists as to whether the employee [i.e., Pullins] could resume her duties by the end of the FMLA-leave period." It is undisputed that the date that Pullins exhausted her 12-week allotment of FMLA leave was September 22, 2017. It is also undisputed that Pullins was not released to return to work at that time. At the end of August 2017, Dr. Schubert extended Pullins' time off work for an additional 30 days, thus through the end of the statutory-leave period. Dr. Schubert did not release Pullins to return to work until November 15, 2017—

25

and that was on a limited basis where she was restricted to working four hours daily. Therefore, Conagra is entitled to summary judgment on Pullins' FMLA claim brought under an entitlement theory. *Edgar*, 443 F.3d at 506-07 (affirming summary judgment for employer); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 778, 784-85 (6th Cir. 1998) (finding that defendant-employer was entitled to summary judgment on FMLA claim because undisputed evidence showed that plaintiff-employee would not have been able to return to work by the statutory deadline, where she was not released to resume her duties until over two weeks after her FMLA leave period ended).

### (2) Retaliation theory

"Under the retaliation theory (also known as the discrimination theory), in contrast, the employer's motive *is* an integral part of the analysis" regarding whether an employer violated the FMLA. *Edgar*, 443 F.3d at 508 (emphasis in original). "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* (emphasis in original). "The central issue under the retaliation or discrimination theory is whether the employer took the adverse action because of a prohibited reason or for a legitimate, non-discriminatory reason." *Curry v. Brown*, 607 F. App'x 519, 522 (6th Cir. 2015).

If the claim is based solely upon circumstantial evidence of unlawful conduct, then the claim is evaluated under the *McDonnell Douglas* burden-shifting framework. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Thus, in that instance, "[a] plaintiff must typically make a prima facie showing that: (1) [s]he engaged in a statutorily produced activity; (2) [s]he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Daugherty*, 544 F.3d at 707; *see also*

26

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (including as an additional element that the employer knew that the employee was exercising her FMLA rights).

"However, when such an action is based upon <u>direct</u> evidence of discrimination – i.e., that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions – a plaintiff need not proceed under the *McDonnell Douglas* analysis." *Daugherty*, 544 F.3d at 707 (internal quotation marks omitted) (emphasis added). "[A]n employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action." *Id.* "Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

Direct evidence of discrimination is evidence that "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Daugherty*, 544 F.3d at 707 (internal quotation marks omitted). "The evidence must establish not only that the plaintiff's employer was predisposed to discrimination on the basis of [the FMLA], but also that the employer acted on that predisposition." *Id.* (alteration in original). "[G]eneral, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Id.* at 708.

The Court disagrees with Pullins' argument that there is direct evidence of discrimination. A fact finder would be required to draw an inference in order to conclude that Verhoff (Conagra) retaliated against Pullins when he mentioned FMLA during the conversation in which he terminated her. *Daugherty*, 544 F.3d at 707-08. Further inferences would be required in order "to support a finding of discriminatory animus." *Id.*; *Clark v. Walgreen Co.*, 424 F. App'x 467, 472

(6th Cir. 2011). In fact, contrary to discriminatory animus, the context of Verhoff's statements demonstrate that his reference to FMLA (and STD) concerned efforts to try to help Pullins keep her job and consideration of ways in which perhaps that would be possible. *See Curry*, 607 F. App'x at 524 (affirming finding that employer statements were not direct evidence of discrimination under the FMLA where the statements "could instead be inferred as conciliatory in that [supervisor] was encouraging [employee] to think about her health and that the transfer would mean less stress at work"). Thus, the situation here contrasts starkly with situations where courts have found direct evidence of FMLA discrimination, such as in *Daugherty*, where the employee's boss "threatened him that if he took his final FMLA leave, he would not be allowed to return to work" (and then he was fired before returning from work). *Daugherty*, 544 F.3d at 708.[10]

Thus, the *McDonnell Douglas* burden-shifting framework applies. First, the employee must make the prima facie showing set forth in *Daugherty*, above. "The burden of proof at the prima facie stage is minimal; all that the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283. Next, assuming that the employee has made the prima facie showing, the employer must "articulate[] a legitimate, nondiscriminatory reason for discharging" the employee. *Id.* at 284. If the employer does so, then the burden reverts back to the employee, "who must show that the employer's proffered reason was in fact pretext for a discriminatory or retaliatory motive." *Parkhurst v. Am. Healthways Servs., LLC*, 700 F. App'x 445, 449 (6th Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. at 804). The key question

---

[10] Pullins also cites to *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419 (6th Cir. 2014) to support her argument that Verhoff's statements are direct evidence of retaliatory FMLA discrimination. However, that case too is factually distinguishable: the employee's supervisor referred to the employee as a "liability" immediately after the employee had requested FMLA leave and terminated his employment that same evening. *Demyanovich*, 747 F.3d at 432.

28

concerning "pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.*

Here, particularly given that she exhausted her FMLA leave well before she returned, it is questionable whether the time between Pullins' return from FMLA leave and her termination would suffice "to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." *Seeger*, 681 F.3d at 283. Regardless, however, Conagra has articulated a legitimate, nondiscriminatory reason for terminating Pullins, as extensively detailed above in the sections concerning her ADA claims: she could not perform the essential functions of her position. *See Edgar*, 443 F.3d at 513-14 (an employer can rebut the employee's prima facie case of discrimination in retaliation cases where, as a legitimate and non-discriminatory reason for discharging the employee, medical information known to the employer prior to the termination decision showed that the employee could not return by the end of the statutory-leave period).

Pullins has failed to show that Conagra's proffered reason for terminating her was, in fact, "pretext for a discriminatory or retaliatory motive," or that there is a genuine issue of material fact. In this analysis, "context matters." *Parkhurst*, 700 F. App'x at 450. Undisputed evidence demonstrates that Conagra's proffered reason for terminating her was based in fact, motivated the action (along with concern for Pullins' health and safety), and were sufficient to motivate the termination. *Id.* at 449. And, Verhoff's statements do not evidence FMLA-related animus. *Id.* at 450. Instead, it is obvious that the purpose of Verhoff's reference to FMLA was to ensure that Pullins understood that taking more FMLA leave was no longer an option. Despite assuming as true Pullins' evidence and drawing all reasonable inferences in her favor, a reasonable jury would not be able to find that Conagra fired Pullins *because* she took FMLA leave. *Edgar*, 443 F.3d at 508; *Parkhurst*, 700 F. App'x at 450 (finding that the supervisor's statements were insufficient to

allow a reasonable jury to find it more likely than not that the employer's proffered reason for terminating her was pretext for FMLA-related retaliation, even when drawing all reasonable inferences in her favor). This conclusion is further supported by the fact that Conagra continuously approved Pullins' multiple FMLA leave requests throughout 2017 through the time that she had exhausted her entire allotment, and that she was terminated over two months after she had exhausted her 12-week allotment of FMLA leave.

Therefore, Conagra is also entitled to summary judgment on Pullins' FMLA claim brought under a retaliation theory. Finally, the Court denies Pullins' Motion because Conagra is entitled to summary judgment on all of Pullins' claims.

## IV. CONCLUSION

In summary, the Court finds that there is no genuine issue of material fact, and Conagra is entitled to judgment as a matter of law, on the claims against Conagra. For the reasons stated above, the Court **GRANTS** Defendant Conagra Brands, Inc.'s Motion for Summary Judgment (Doc. 25) and **DENIES** Plaintiff Chelsea Boardwine Pullins's Motion for Partial Summary Judgment (Doc. 16). Given that there are no viable claims remaining, this case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, June 9, 2020.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE